THE STATE OF NEVADA, ON RELATION OF ITS DEPARTMENT OF HIGHWAYS, APPELLANT, *v.* CECIL G. CAMPBELL AND CHARLOTTE CAMPBELL, HUSBAND AND WIFE, RESPONDENTS.

No. 4644

January 31, 1964 388 P.2d 733

*Harvey Dickerson,* Attorney General, *Robert J. Potter,* Deputy Attorney General, *Eli Grubic,* Special Deputy Attorney General, for Appellant.

*Goldwater, Taber and Hill,* of Reno, for Respondents.

# OPINION

By the Court, BADT, C. J. :

This is an appeal taken by the State of Nevada on relation of its Department of Highways from that part of the judgment entered by the district court "assessing damages" against appellant for its condemnation of parcels of land known as 80–B and 80–C and for severance of parcel 80–B. Our main concern is with appellant's contention that the trial court's award of compensation to respondents lacks substantial support in the evidence. We have concluded that this contention is without merit.

80–B is known as the Rye Patch Ranch. 80–C is the parcel of land containing the structures known as Humboldt House. The taking of 80–B was a complete severance. The parcels of land involved are situate along what was known as Highway 40 between the cities of Lovelock and Winnemucca, in Pershing County, and had, before the taking, full access rights to the highway. The parcels were taken by the Nevada Highway Department for the purpose of constructing an interstate freeway, known as Interstate 80. Certain parts had been theretofore subject to a right-of-way in the State. The particular taking and construction here involved was part of a 13-mile project. The federal government required, in

completing this project, that the actual fee be acquired by the State and such was the purpose of the condemnation suit.

Prior to the taking, all parcels here involved had complete access to Highway 40. Interstate 80 has now been completed and fenced off. The parcels involved no longer have access to such highway.

The case was tried to the court without a jury in April, 1963, and submitted on written briefs, whereupon the trial court filed a memorandum opinion in which it awarded the respondents damages for the taking of their property as follows:

| | |
|---|---|
| Parcel 80–A (not involved in this appeal) | $27.50 |
| Parcel 80–B | 6,499.76 |
| Parcel 80–C | 65,003.55 |
| Severance damage from the taking of parcel 80–B and the construction of the freeway, resulting to the remaining lands of respondents' Rye Patch Ranch | 5,797.50 |

Formal findings followed, together with judgment of condemnation.

The issues before the district court were to determine the value before the taking and the value after the taking. Virginia & Truckee R. R. Co. v. Henry, 8 Nev. 165. The same applies to the severance damage. These were questions of fact. Virginia & Truckee R. R. Co. v. Henry, supra.

Appellant's two professional witnesses consisted of Calven S. Aerick, its "staff appraiser," and Merton E. Domonoske, "professional fee appraiser for appellant." Both of these witnesses valued part of the land taken in parcel 80–B as adapted to commercial use and therefore placed its worth at $150 per acre. Campbell was in agreement as to the acreage valuation.

We refer briefly to the valuation placed by the respective witnesses on the parcels taken by the State. As to

parcel 80–B (a part of respondents' 8,260-acre Rye Patch Ranch), 43.12 acres on the east side of the highway were taken. (Consideration need not be given to an additional 31.76 acres comprising a 200-foot-wide easement for a right-of-way for existing Highway 40, already owned by the State, as the additional vesting of the fee would be of minimal value.) Campbell considered the entire 43.12 acres to have commercial value. Domonoske accorded commercial value to 4 acres, Aerick to 6.5 acres. The court accepted Campbell's testimony, awarding a total of $6,468.[1]

The severance of parcel 80–B left 9.5 acres "landlocked" on the west side of the highway. Aerick valued it at $9 per acre, Domonoske at $8.50 per acre (both characterizing it as grazing land), and Campbell at $150 per acre, characterizing it as commercial.

As to the severance on the east side of the highway resulting from the severance of parcel 80–B, Aerick allotted a value of $2,500, Domonoske awarded it "nothing," and Campbell figured a loss of 48 acres at $137 per acre. The per acre figure he arrived at by reducing the $150 per acre commercial value by $13 per acre grazing value, the value of the land after the taking.

The west side severance and the east side severance produced, according to Campbell, a loss of $7,837.50. The court awarded $5,797.50.

In valuing parcel 80–C, the Humboldt House itself, Aerick gave to the land involved $350 an acre; Domonoske, $250 an acre. To the improvements, Aerick accorded $38,620; Domonoske, $33,175. As severance damage, Aerick found "none"; Domonoske, $4,386. Campbell refused to particularize, but testified that Humboldt House had a value of $90,000.[2] The totals resulted as follows: By Aerick, $39,500; by Domonoske, $38,150; by Campbell, $90,003.55; by the court $65,003.55.

---

[1] Plus allowance of $31.76, the only additional damage for the taking of the underlying fee on 31.76 acres over which the State had an existing easement for a right-of-way for Highway 40.

[2] Plus allowance of $3.55, the only additional damage for the taking of the underlying fee on 3.55 acres over which the State had an existing easement for a right-of-way for Highway 40.

Not only are there serious contradictions in the testimony of the State's two expert witnesses, as noted above, which may indeed have influenced the court in its rejection of their testimony, but they also differed in their approach or method of evaluation. Aerick testified, "Well, in appraising, our office used the three approaches to value: the market approach, the cost approach, and the income approach." He then indicated that he considered the cost approach as "the final approach." This is determined by finding actual cost less depreciation. The market approach was defined by the witness as finding sales of comparative properties, and valuing the subject property by comparison. (Incidentally, we note here that this appears to be precisely what the witness Campbell did—finding the most comparable sale to be of the Buena Vista property and the conclusion that Humboldt House was worth twice Buena Vista.) He then defined the income approach as "the processing of income which the property will earn by capitalization into a value which you can use." He said this method has hazardous elements, "but you use it to correlate the cost and the market approach."

He arrived, as above indicated, using his three methods of approach, at a total value, including severance damages, of $39,500. In applying the compensation approach or income approach he capitalized income at 9 percent per annum, being 7 percent income and 2 percent "return of capital." On cross-examination he testified that at 4 percent the value would be capitalized at $69,850, but the witness stated, "I would never use 4%." At 5 percent the value would be capitalized at $55,880. (Later he corrected his figures to show that, capitalized at 4 percent, the value would appear to be $72,110, and, at 5 percent, $58,140.) This was his testimony taken at the trial in April, 1962. In a preliminary statement made on March 19, 1961, the witness had indicated that for roadside commercial properties replacement cost less depreciation, plus the land value, should be used. The witness then stated:

"In order to in any way approximate a value indicated by the cost approach, the expected return on the land

and improvements would have to be cut to approximately five percent. Due to the lack of rents or leases on comparable roadside property, there was insufficient data to adequately establish such a 'cap' rate. Thus it can be stated that it appears there is a market for such roadside businesses and certain people will operate them usually on an owner-operator basis taking less for their labor and investment but being certain of a regular income and reduced living expenses."

The market approach was not used at all by the witness at that time.

Thus, appellant introduced the capitalization-of-income method into the case. Domonoske did not use this approach at all. It will be noted that the capitalization approach, at 5 percent or at 6 percent testified to by Aerick on cross-examination, closely approximates the value found by the court.

In State v. Shaddock, 75 Nev. 392, 344 P.2d 191, after evidence that the condemned land produced $3,600 a year in rentals and that just compensation would be a sum sufficient to produce an income of $3,600 a year, this court held that it was proper to permit a witness to testify relative to the value of an asset capable of producing such income and said: "Such evidence was given by an expert and was solely for the purpose of assisting the jury in determining the value of this asset. Appellant's witnesses themselves capitalized the net income in arriving at market value from the income approach, using a different capitalization rate. It was within the province of the jury to decide what rate if any to use after considering all of the evidence relating thereto and the reasons given for the various conclusions."

Campbell was a member of the Board of County Commissioners of Pershing County for 10 years. He was a director of the County Commissioner Association of the Western States and for the past 2 years was president of that association. He testified that he was familiar with land values in Pershing County; that he had made it a practice to study these land values and he familiarized himself with land values in Pershing

County through checking with the owners and the sellers and talking to them and through conversations with the purchasers, that he had an opinion as to the market value of Humboldt House, being parcel 80–C involved in this proceeding. His opinion as to such market value was $90,000[3] as indicated in the list above.

As a member of the Board of County Commissioners he was for 10 years a member of the County Board of Equalization, which dealt directly and exclusively with land and other values for purposes of taxation. NRS 361.340, 361.345.

As to the severed parcel of land on the west side of the highway comprising 9.5 acres, the witness testified that it was completely isolated. It became of no use to him whatsoever. "I cannot get to it. There is no frontage road to it. I have no access to it after the freeway is put in there. I cannot put water on it, livestock or anything else. I would have to trespass over private-owned land to get to that area. * * * You cannot get to it from the freeway after it is constructed * * *. You can only get off the freeway at two points, and then I would have to trespass over private-owned land to go to that 8.41 acres.[4] I put a valuation on it of $150 an acre, or a total valuation on the parcel of $1,261.50."

As to the damage resulting from the remaining land by the severance of the parcel just east of the highway, he testified: "The price I set on it is $6,576 and I will explain it in this way. At $150 per acre, and there is approximately, taken from the maps as close as we can figure, there is 7,100 feet of frontage. * * * So taking the frontage, the runs and parcel, and that is Parcel 80–B on the east side and where it ends, figuring a depth of 400 feet which has commercial value, and the highway is taking 100 feet off of that, approximately, leaving me 300 feet of what I call a business area, and commercial ground, and taking that and multiplying that by the frontage and [arriving at] 48 acres plus in round figures, I figured 48 acres was left in that tract

---

[3]See footnote 2, supra.

[4]Early testimony identified the area as 8.41 acres, but it was later established that the area was 9.5 acres.

of ground. * * * That is took out of the commercial basis and put onto grazing ground. The way I come to this figure is I took 48 acres times the prevailing price that I have used for my grazing ground of $13 and subtracted it from the ground that I figured for the full 400 feet and that gave me the figure of $6,576."

The original Humboldt House was adjacent to the yards of the Southern Pacific Company. After Highway 40 was constructed, in 1926, Campbell, his father, and brothers razed the old Humboldt House and moved up to the highway and it has been operated there ever since.

Mr. and Mrs. Campbell and their three children lived there, and operated a general merchandise business, including a bar, service station and garage, grocery store, hardware. Cabins and trailers were for rent. They served gold mining property in the vicinity. People from every walk of life came back again and again to meet at Humboldt House. It had a good firm tourist trade, and its reputation persisted after Highway 40 was put in. Many people came there on account of its good water supply. They had a "dug" well that had never been pumped dry, which filled a 4,000-gallon redwood tank to establish pressure.

On cross-examination, in response to the question, "Will you tell us how you arrived at the $90,000 figure [for parcel 80–C, Humboldt House] ?" the witness testified without objection, "I had a $100,000 offer in 1959 and a $65,000 offer in 1947." He testified by whom these offers were made and then continued: "And I have studied sales of real estate, places and parts in Pershing County and that is how I set my figure on the worth of my buildings. * * * I studied real estate values over a period of time and the different transactions, real estate, in part, through Pershing County, and the acreage over—and the businesses that were sold in that county, and that is how I derived the figure on my house and place of business." Asked for further details, he referred to the Buena Vista sale. "It took place five times since the original. It has sold for $45,000. I do not figure there is any comparison to mine, because that place has no record [no such general reputation,

and because of the better water supply at Humboldt House]." He answered further detailed questions on cross-examination as to the purchasers and sellers, etc.

Appellant insists that the awards made by the court are unsupported by any substantial evidence. We are unable to agree with this contention.

Appellant's brief concludes: "Appellant does not question the competency of an owner of land to testify to its value, but believes that the *credibility* of such testimony should not summarily equate with its competency." (Emphasis supplied.) But credibility by whom? In oral argument appellant urged that Campbell's testimony was not entitled to any *weight*. But this court has never looked at the scales over the trial judge's shoulder to determine whether the fact finder correctly read the weight.

The competency of respondent to testify, as admitted by appellant, was firmly established in State ex rel. Dept. Highways v. Olsen, 76 Nev. 176, 351 P.2d 186. Appellant points out, however, that in that case respondent had owned the property for 10 years, owned other business properties in Reno and leased the same, was aware of market values of her own and surrounding properties, and compared recent sales of nearby land. We have above outlined Campbell's experience and background. It is entirely unnecessary for us to consider whether he was better or less qualified to testify than Mrs. Olsen in State v. Olsen, supra. In short, appellant's contention fails to recognize the function of this court. When it speaks of the weight to be given to the testimony of certain witnesses, it can refer only to the weight to be given to it by the trial court. When it states that credibility should or should not be accorded to the testimony of a witness, it addresses itself to the credibility to be accorded by the trier of the facts. There indeed may be certain exceptions which are not applicable here and which are not necessary to discuss. The record discloses that the learned trial judge was alert to all of the issues presented, to the contentions of the parties, and the testimony of the witnesses. In State v. Pinson, 66 Nev.

227, 207 P.2d 1105, in which the condemnees appealed from an award which they considered inadequate, this court said: "We are, in effect, asked to say that the trial court was in error in accepting the testimony of respondent's witnesses rather than the testimony of appellants and their witnesses. This we cannot do." We have no difficulty in concluding that there was substantial evidence to support the court's findings and judgment.

In United States v. Certain Lands, Etc., 3 Cir., 183 F.2d 320, United States Circuit Court of Appeals remarked: "Finally, it is difficult to see that clear error exists, for the evidence of value was highly conflicting and the compensation awarded is within the range of evidence."

This court in Virginia & Truckee R. R. Co. v. Henry, 8 Nev. 165, in sustaining a condemnation award having to do mainly with severance damage, said: "The district court saw that there was substantial testimony [in the report of the commissioners] to sustain the award, and that all such said to have been omitted could not touch the issue." In that case the court rejected the contention "that the measure [of the damage] is filled by giving the private person the market value of the land taken." The court held that the restriction of the allowance to "the naked market value of the property taken," would violate the constitutional requirement for "just compensation." The court further stated: "It is difficult to imagine an unjust compensation; but the word 'just' is used evidently to intensify the meaning of the word 'compensation;' to convey the idea that the equivalent to be rendered for property taken shall be real, substantial, full, ample; and no legislature can diminish by one jot the rotund expression of the constitution. * * * [As to] the absolute protection of the individual by just compensation—there has been, could be, no dispute."

One additional error is asserted by appellant. Respondent was asked: "How much would you have to get from the property to support yourself and your family?"

Appellant objected, citing 5 Nichols, Eminent Domain § 19.3(1) and 18 Am.Jur., Eminent Domain § 345, to the effect that evidence of profits derived from a business conducted on the property is too speculative, uncertain and remote to be considered as a basis for computing market value in condemnation proceedings. This does indeed appear to be the rule. However, this court has consistently held that where inadmissible evidence has been received by the court, sitting without a jury, and there is other substantial evidence upon which the court based its findings, the court will be presumed to have disregarded the improper evidence. Alamo Airways, Inc. v. Benum, 78 Nev. 384, 374 P.2d 684.

We find no error, and are of the opinion that the judgment should be sustained on the authority of State ex rel. Dept. Highways v. Olsen, 76 Nev. 176, 351 P.2d 186.

Affirmed with costs.

McNAMEE and THOMPSON, JJ., concur.